Good morning. May it please the Court, my name is Victoria Chuggin and I represent Ms. O'Neal. I'd like to focus on a few arguments in this case, two of the reasons that the administrative law judge in this case rejected the medical evidence, the listings of impairment, and also the lay testimony just a little bit. Just as background, Ms. O'Neal suffers from a complex web of medical and psychological impairments, including anxiety, hypertension, and kidney disease. She develops stressors in her life, which trigger her anxiety, then headaches, then abnormally high blood pressure, which result in numerous, as we've all noticed, hospital emergency room visits. Now the administrative law judge rejected nearly all of the medical evidence in this case. There were five treating physician opinions in addition to the treating kidney specialist that he rejected. Dr. Rashid found that Ms. O'Neal was severely limited, which means that she can perform less than sedentary work. Well, counsel, the difficulty that I see for your position is that there were a number of treating doctors who stated opinions regarding your client's level of ability to work, and their check-the-box forms were not consistent with each other. So by definition, ALJ had to look behind them and figure out which one was right. You had at least one, Dr. Powell, who said that she was capable of sedentary work. That's right. And Dr. Murray said sedentary work part-time, and that's in conflict with Dr. Rashid and Dr. Smith. Severely limited. And they both said that she was refusing to follow treatment plans that might have alleviated some of her problems. On the first point, all of these doctors found that she could perform sedentary or less work, and the administrative law judge limited her to light work. So that addresses the first issue. The other point about her was- Well, it doesn't entirely. I mean, my point is if the treating doctors all say something different, then the ALJ is left to evaluate the medical evidence in some other way besides just saying treating Dr. Trumps, because they're all different. That's absolutely true. However, the administrative law judge's decision itself has to be supported by substantial evidence, and so to come up with a higher level of functioning than all of these treating physicians came up with was inconsistent with the treating physician evidence. He relied on the non-treating doctors. Right, he relied on the non-treating. Now, I was actually getting to, I think those are the two most important points in this case, why the administrative law judge rejected the treating, both the treating and the examining and the other evidence. And he gave similar reasons for rejecting the failure to cooperate with treatment. Well, Ms. O'Neill was a person who was suffering from anxiety. Her mind raced. She couldn't sleep. Even the administrative law judge limited her to simple tasks. Now, her treatment regimen involved taking up to 15 medications a day, some twice a day, some three times a day. That regimen changed. She was taking one hypertensive medication one week, another one the next week. She was taking medication for anxiety, for nausea, for stomach problems. She was taking diuretics. Now, it's hard to believe that someone who is limited to simple tasks could necessarily follow that kind of complicated regimen. The administrative law judge is required to look at reasons why and to consider reasons for not following treatment, and that's based on case law and also on Social Security rulings. The administrative law judge in this case did inquire a little bit about why she wasn't going to appointments always and taking medication, and she did provide some reasons about how complicated it was. She explained that she had problems with insurance coverage, that sometimes she would have to go to the pharmacy three and four times a week just to manage her medication. Some medications she would just be disapproved. One week she's taking them, the next week she's not. These are all reasons, good reasons, why a person, especially a person who's got depression and anxiety would have trouble managing, complying with all of the doctor's treatment recommendations. Another point on that is that the administrative law judge didn't show that following that treatment would have restored her ability to work, and we get that from the treating nephrologist, the kidney specialist. In this case, Dr. Keech has said that the blood pressure medication, which is really blood pressure seems to be at the heart of this case, was not effective when Ms. O'Neill's stress was too high. So she would be rolling along, doing fine with her blood pressure medication. She would have a stressor such as, in this case, lots of things happened. She separated from her husband, her children were incarcerated. She had to watch her grandchildren. All these things happened in her life. She would end up at the emergency room. At the emergency room, she'd sometimes stay a few hours. She'd sometimes stay up to three days. Over that course of time, they'd put her back on her hypertensives, and then the stress would come down and she would do fine. Dr. Keech says this on many occasions. She says, once her life situation settles down, her blood pressure usually responds, but can be next to impossible to control until this occurs. And that's at page 1166. She also stated that she could not control Ms. O'Neill's blood pressure without the help of a mental health specialist. And there are a number in the briefing, there are a number of references to how control of the mental problem was at the heart of controlling the hypertension, which then led to the aggravation of the kidney disease. Now, another reason that the administrative law judge rejected this medical evidence, all of it, was because he felt that she, Ms. O'Neill, was engaging in untoward self-limiting and addictive behavior. And what he's talking about is drug-seeking behavior. It is true Ms. O'Neill went to the emergency room a lot, and she went for headaches at times. But she also went with blood pressures that were over 200. During these admissions, she would have nausea, vomiting, chest pain. She wasn't going just for headaches. She was not a drug addict. Nothing in this entire file suggests that she's a drug addict looking just for drugs. The fact that some doctors refused to treat her with narcotics doesn't mean that her pain wasn't real. It simply means that they were worried for her. They didn't feel that treating her with narcotics at the emergency room was the best way for her to proceed with her headaches. What they preferred to do was to have a plan and to have a treating physician in charge of her narcotic or pain medication, and that's what happened. So those were two of the reasons for rejecting that I thought warranted some clarification. There was also the opinion of Dr. Ankuda. And Dr. Ankuda was an examining psychologist. The administrative law judge said that he accepted that opinion. However, there were two aspects of the opinion that he didn't accept. The first was that Ms. O'Neill could have difficulty recalling even simple instructions at work, and the administrative law judge found that she could perform simple work. He provided no reasons for rejecting that. The second opinion from Dr. Ankuda was that Ms. O'Neill would need special supervision in order to work. He didn't say she could work. He said she might be able to work if she had special supervision. Again, that is not an opinion consistent with his finding that she was not disabled. Thank you. You've got less than two minutes. Do you want to save it for rebuttal? I would, please. Thank you. Good morning. May it please the Court. I'm Nancy Michelini for the Commissioner. There are two ñ Could you speak a little louder or pull the microphone down? Thank you. There are two things that I need to correct in the record. In her reply brief, Ms. O'Neill has made two misstatements of fact. In her listings argument, O'Neill said that the ALJ did not consider listing 6.02. That's in her reply brief at 15. She said that the ALJ didn't even mention listing 6.02. However, if you look at the ALJ's decision in the record at 22, the first full paragraph after finding 4, the ALJ says, and I quote, the claimant's renal insufficiency does not meet or equal listing 6.02. So clearly he considered it. The other misstatement in O'Neill's reply brief is at 23. She said that the ALJ did not specifically reject Ms. Shin, and that is O'Neill's daughter Ms. Shin's testimony because it was inconsistent with O'Neill's activities. However, in the decision at 24, the ALJ said, I have considered this reporting, Ms. Shin, but note that it is inconsistent with the claimant's wide range of activities. So he specifically rejected it for those reasons. So I would like the Court to make note of those two misstatements in the reply brief. This Court should affirm the ALJ's decision because it's based on substantial evidence and there's no legal error. The ALJ considered all of the evidence, and you, Your Honor, talked about the opinions from Dr. Murray and Dr. Rasheed. However, you didn't discuss the opinion of Dr. Keech. Dr. Keech, her treating physician, and she's the kidney specialist, was given a medical source statement and asked for functional limitations. That's at 1089 in the record. She actually crossed out the sections in the medical source statement asking for functional limitations, and she put NA, not applicable. So Dr. Keech herself found or opined that Ms. O'Neill had no functional limitations from her hypertension and her kidney disease. The other statement that counsel just said about Dr. Ankuda, I just wanted to correct that. Yes, the ALJ did find that she could do simple, repetitive work, and Dr. Ankuda said that she would have problems or she could possibly have problems with simple instructions. However, the ALJ considered Dr. Nelson and Dr. Reed's opinion, the state agency consultants. Now, they also reviewed Dr. Ankuda's opinion in his report, and they both noted that the memory testing, the testing that Dr. Ankuda provided, she would definitely have problems with multi-step tasks. However, she could still do simple one- to two-step tasks, and so that's what the ALJ adopted in the RFC. Ms. O'Neill didn't challenge the credibility at this level at the Ninth Circuit. However, she did challenge it before the district court, and the district court wrote a very, very thorough opinion. I would urge the court to look at the district court opinion. Could you tell me for just a moment, could you address, I read the transcript of the hearing and testimony of Dr. Nelson who was on the phone at the hearing. Yes. You know, I haven't quite seen something like this in all the transcripts that I've read, but he starts out by saying, well, you know, I had a terrible problem with these medical records in the first place. I could hardly lift them. They're well over 2,000 pages, and this whole situation is very confusing. And you read the whole thing, and you don't get the feeling that he really went through the records. Well, he said he didn't have an opportunity to read parts of the record. Excuse me, Your Honor? He said he did not have an opportunity to read parts of the record. There was too much. Well, he did say it was a huge record, and it is. It's back there in my cases there that I did bring it. It's over 3,000 pages, and frankly, it is the largest record I've ever dealt with. However, what Dr. Nelson did say, testify to, is that he read most of the summaries, but he did not read through each and every single page. Dr. Nelson is a physician. He's got his medical degree from Harvard Medical School. He's currently a clinical professor of medicine at the University of Washington. He's hired as an expert witness. I'm not a doctor, but I am sure that doctors know how to read medical records, and they know how to skim medical records and look for what's important in the record and what they need to know in the record. When he started off his testimony, he had just listened to Ms. O'Neill testify, and she had testified to, oh, she had a skull fracture, she had strokes, she had muscle spasms. And so when Dr. Nelson testified, he started out with, well, I don't find anything in the record to support any of these ailments that she's complaining about. There's no evidence of muscle spasms. There's no evidence of skull fracture. There's no evidence, no objective evidence of stroke in the record. And that's when he then started getting into saying, this is a huge record. In fact, I had a hard time lifting it. But he said he read most of the summaries. Now, he was able to render a medical opinion. And in his medical opinion, her impairment, she had mild renal insufficiency, and he noted what those values were of her creatinine levels. And he found that that did not meet the listings. And, in fact, he testified that there was nothing, that she had no physical problem that would prevent her from working. Now, of course, the ALJ considered that. He listened to that. He did adopt Dr. Nelson's opinion that she didn't meet the listings, she didn't meet or equal the listings. However, he didn't completely adopt that she had no physical impairment that would affect her working. And he did find severe the hypertension and the renal insufficiency. Also, the court should consider that when, in addition to Dr. Nelson's testimony about meeting the listings, SSA 831, the form that is in the record at, I believe it's at 33 and 35, it's called the Disability Determination and Transmittal Form, SSR 96-6P, which is, by the way, it's in my brief. I mentioned it in my brief at the beginning. A signature by a state agency medical or psychological consultant on this form ensures that consideration by a physician has been given to the question of medical equivalence at the initial and the reconsideration levels. By the time a case gets to this level, gets to before you, it has gone through some very intense scrutiny. At the initial level, it is evaluated. All of the evidence is evaluated. At the reconsideration level, it's a fresh set of eyes. It's a completely different medical expert who takes a look at the evidence, looks at all the evidence, they make a decision. It gets to the ALJ. In this case, the ALJ then called on the services of Dr. Nelson as well, and then the ALJ reviews all of the evidence and makes a decision. In this case, it went to the district court, the magistrate judge in this court. In this case, it's Magistrate Judge Mary Alice Tyler, who is, I will say, well-known for being very, very particular, meticulous with details, and goes over all of the details. She reviewed this record and found that the ALJ's decision was based on substantial evidence. Then O'Neill filed objections in this case, so it went before Judge Robart. You know, you've got 40 seconds left. I would just tell you, I'm certainly not influenced by that argument. Every time we hear a case, what you say is true, and I don't know your particular magistrate you're talking about, but I assume all magistrates are very careful, thorough people. So I don't think that the fact that it's gone through each of these levels. I'm trying to explain to the court that even though this is an enormous record, and it will be enormous for all of you to have to go through and to make a decision on this case, rest assured that it has undergone intense scrutiny by the time it gets to this level as well. And my point is, is that I would urge this Court to review the district court decision, because the district court decision is very, very thorough and very well written, and I would ask this Court to affirm the ALJ's decision. And I see I'm just about out of time. I must close. More than that. Thank you very much. Okay. Well, regardless of how many levels of review this case has been through, the administrative law judge's decision is the decision that we're looking at right now, and the administrative law judge didn't discuss his findings for a listing. And boilerplate decisions, boilerplate findings are not allowed for listings, determinations. Magistrate Judge Tyler did do a very thorough job, but I argue in my brief, that her job was a little too thorough. She exceeded the scope of review by making a listings determination of her own, which she should have been looking at, is whether the administrative law judge did enough in his listings determination. If not, then that case, the case should be returned to the administrative law judge to make the listings determination. These are findings of fact that shouldn't be made by a district court. As for the lay testimony, the inconsistencies with the wide range of activities, I argue in my brief that the activities were certainly not as wide and varied as the administrative law judge argues. One case in point, he argues that Ms. O'Neill had her grandchildren living with her. Well, during that time, it was so difficult for her that she was hospitalized twice. The reference to Dr. Keech, the nephrologist, who didn't provide any functional limitations, well, we don't know why she put not applicable. Does she not complete functional limitations? Some doctors don't. Not applicable does not mean that there were no functional limitations. We do have five treating physicians who indicated that Ms. O'Neill was limited to sedentary or less work, which under the medical vocational guidelines as of age 50 would mandate a finding of disability. Now, we don't think the medical guidelines. What was your client's age at the time? I thought she was under 40, 44. She was 44 on her alleged onset date. She turned 50 in 2008 while the case was pending. So finally, I think that this case could warrant reversal for payment of benefits, but certainly a very appropriate remedy would be a remand to reconsider the listings, to call a vocational expert instead of relying on medical vocational guidelines, and to reevaluate the medical evidence, and to have a medical expert at the hearing who, even if he hasn't poured or she hasn't poured through, it's actually 3,000 pages of record, answers questions. If an administrative law judge is going to rely on medical expert testimony, that medical expert should provide reasons for the opinion. Thank you, counsel. Cases argued will be submitted.
judges: Reinhardt, Graber, Paez